**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

MAXIMUM AVAILABILITY LIMITED,      )
a New Zealand corporation,                      )
                                                             )
                        Plaintiff,                         )
v.                                                            )
                                                             )
COMPUTER BUSINESS SOLUTIONS, INC.,   )
an Oklahoma corporation,                      )
                                                             )
                        Defendant.                      )

FILED

JUN 2 9 2009

Phil Lombardi, Clerk
U.S. DISTRICT COURT

Case No.

**09 CV - 4 1 6 CVE    PJC**

## COMPLAINT

COMES NOW Plaintiff Maximum Availability Limited ("Maximum") against Computer

Business Solutions, Inc. ("CBSI") and alleges and states as follows:

## JURISDICTION AND VENUE

1.      Maximum is a corporation organized and existing under the laws of New Zealand,

with its principal place of business in Auckland, New Zealand.

2.      CBSI is an Oklahoma corporation with its principal place of business in Tulsa,

Oklahoma.

3.      The United States and New Zealand are both parties to the Convention on the

Recognition of Foreign Arbitral Awards of June 10, 1958, also known as the New York

Convention.

4.      This proceeding arises under the Convention on the Recognition of Foreign

Arbitral Awards of June 10, 1958.  Thus, this Court has subject matter jurisdiction pursuant to 9

U.S.C. § 203 and pursuant to 28 U.S.C. § 1331.

5.      Venue is proper in this Court pursuant to 9 U.S.C. § 204 and pursuant to 28 U.S.C.

§ 1391(c).

**OPERATIVE FACTS**

6.    Maximum is a New Zealand corporation that develops and licenses its proprietary disaster recover software, *noMAX, worldwide.

7.    Effective July 1, 2007, Maximum and CBSI entered into a valid, commercial, written agreement which allowed CBSI to re-sell the *noMAX software products in the United States to end users, for which Maximum would receive monthly lease fees. (Together the Contract Details and the Application Service Provider Terms, are referred to herein as the "Arbitration Agreement.")  A duly certified copy of the Arbitration Agreement is attached hereto as Exhibit "A."

8.    Paragraph 18.1 and Schedule A of the Arbitration Agreement provide for the arbitration of disputes relating to the Arbitration Agreement in accordance with the procedures set out in Schedule A and the Arbitration Act 1996 (New Zealand).

9.    In or about March 2008, a dispute arose between Maximum and CBSI relating to the Arbitration Agreement.

10.    On or about July 8, 2008, notice was given to CBSI of the submission of the dispute to arbitration.

11.    On September 17, 2008 and pursuant to Schedule A of the Arbitration Agreement, Maximum requested the President of the New Zealand Law Society to appoint an arbitrator to settle the dispute between Maximum and CBSI.

12.    By letter dated October 21, 2008, notice was given to CBSI of the confirmation of the appointment of Mr. Chris Darlow as arbitrator.

13.    CBSI was provided a reasonable opportunity to present its case to the arbitrator.

14.    On or about April 15, 2009, the arbitrator determined all issues submitted to him and awarded Maximum the amount of $957,208.32 on its claims and costs in the amount of $9,677.02, for a total award of $966,885.34 ("Award"). A duly certified copy of the Award is attached hereto as Exhibit "B."

15.    The arbitrator provided a signed copy of the Award to CBSI on April 21, 2009.

16.    The Award is binding on the parties; it is final and has not been set aside.

17.    The Award does not exceed the scope of the submission to arbitration, and there were no defects in the composition of the tribunal or selection procedure.

18.    The subject matter of the dispute was capable of settlement by arbitration under the laws of the United States; refusal to recognize this Award would be contrary to the strong public policy of the United States in favor of international arbitration.

**PRAYER FOR RELIEF**

WHEREFORE, Maximum respectfully prays that the Court enter an order confirming the Award, for judgment against CBSI in conformity with the Award in the sum of $966,885.34; together with post-judgment interest and Maximum's costs and attorneys' fees incurred herein and for other and further relief as may be proper and equitable.

Respectfully submitted,

P. Scott Hathaway, OBA #13695
Paige N. Shelton, OBA #20330
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, Oklahoma 74172-0148
(918) 586-8510
(918) 586-8610 fax
shathaway@cwlaw.com
pshelton@cwlaw.com
*ATTORNEYS FOR PLAINTIFF,*
*MAXIMUM AVAILABILITY LIMITED*

3

THE DEPARTMENT OF INTERNAL AFFAIRS 

*Te Tari Taiwhenua*

### APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1.   Country: New Zealand
     This public document

2.   has been signed by Anthony Charles Bennett Coupe

3.   acting in the capacity of Notary Public

4.   bears the seal/stamp of Anthony Charles Bennett Coupe

Certified

5.   at: Wellington                     6. the 22 June 2009

     by: The Department of Internal Affairs

     No: 09164.2

     Seal/Stamp:                        10. Signature:

The purpose of this certificate is only to confirm that the signature, seal or stamp on the document is genuine. It does not mean that the contents of the document are correct or that the Authentication Unit of the Department of Internal Affairs approves of the contents.

**EXHIBIT A**

# Maximum Availability Limited



# Application Service Provider Terms

These Application Service Provider ("ASP")Terms set out the standard terms
that apply to Maximum Availability ASPs. The details of our specific
agreement with you will be recorded in a separate Contract Details form. On
signing a Contract Details form, these ASP Terms together with the Contract
Details form constitute our Agreement with you.

ASP Terms Ref:          ASPT / 1.0

Issued to:              *Computer Business Solutions, Inc*

I CERTIFY THAT THIS
IS A TRUE COPY
OF THE ORIGINAL

A. C. Coupe
Solicitor & Notary
Albany
North Shore City

Application Service Provider Terms

⊛ MAXIMUM AVAILABILITY
Page 7

## 1 ASP Contract Details

### ASP Provider Details

| | |
|---|---|
| Name: | *Computer Business Solutions, Inc.* |
| Address: | *3840 S. 103rd E. Ave, Suite 227* |
| Contact Name: | *Randy Downing* Contact's Position: *President* |
| Phone Number: | *918.641.5800* Facsimile: *918.641.5805* |
| Contact Email: | *rdowning@cbsi.com* noMAX ID: |
| Payment Terms: | As per ASP Order Form |

### Software

| | | | |
|---|---|---|---|
| Selected Software: | *noMAX garrison,<br>*noMAX defender, | Minimum Initial Quantities: | NIL   3 |

### Commencement Date, Territory & Currency

| | | | |
|---|---|---|---|
| Commencement Date: | 7/1/07 | Territory: | US |
| Customer Acquisition Term | 1 year | Currency: | US$ |

**Important Note:** The terms and conditions set out in this Agreement form the contract between you and us. You must therefore comply with and fulfil the obligations in this Agreement. Please ensure that you read and understand this entire Agreement prior to signing below.

### Execution

I CERTIFY THAT THIS
IS A TRUE COPY
OF THE ORIGINAL

Signed for and on behalf of
Maximum Availability Limited:

Signed for and on behalf of the ASP Provider:

Maximum Availability Limited

ASP Agreement Mar 06 (Ver2)

A. C. Coupe
Solicitor & Notary Public
Albany
North Shore City

✦ MAXIMUM AVAILABILITY

Application Service Provider Terms

Page 8

| Signature: | | Signature: | |
|---|---|---|---|
| Name: | Allan Campbell | Name: | Randy Downing |
| Title: | Director | Title: | President |
| Date: | 25/7/2007 | Date: | 6/19/07 |

I CERTIFY THAT THIS
IS A TRUE COPY
OF THE ORIGINAL

Maximum Availability Limited

ASP Agreement Mar 06 (Ver2)

A. C. Coupe
Solicitor & Notary Public
Albany
North Shore City

# Maximum Availability Limited



# Application Service Provider Terms

These Application Service Provider ("ASP")Terms set out the standard terms
that apply to Maximum Availability ASPs.  The details of our specific
agreement with you will be recorded in a separate Contract Details form.  On
signing a Contract Details form, these ASP Terms together with the Contract
Details form constitute our Agreement with you.

ASP Terms Ref:          ASPT / 1.0

Issued to:

A. C. Coupe
Solicitor & Notary Public
Albany
North Shore City

Application Service Provider Terms

## Introduction

(a) This document describes the basic terms and conditions under which we grant you the right to provide our Software to End Users on a leased ("ASP") basis, and forms part of the Agreement between the Parties.

(b) This document also sets out a Software order process detailing the process by which you order Software from us (see clause 2);

(c) The Parties are entering into this document to record the standard terms on which you may promote and offer our Software to End Users on an ASP basis.

## The Terms & Conditions Of Contract

The following are the agreed terms and conditions governing the agreement between the Parties. Defined terms are capitalised.   All defined terms are set out in clause 19.

...ation Service Provider Terms

# Table of Contents

Introduction                                                           3

The Terms & Conditions Of Contract                                     3

1    ASP Contract Details                                             10

Execution                                                            12

2    ASP Order Process                                               13
2.1    Software Order Requirements                                    13
2.2    Acceptance of ASP Order Form                                   13
2.3    Rejection of ASP Order Form                                    13

3    Marketing Performance                                           14
3.1    Marketing Obligations                                          14

4    Initial Entitlements                                            14
4.1    Initial Entitlement                                            14
4.2    Technical Assistance                                           14

5    Hardware Records                                                15

6    Technical Support                                               15

7    Level 1 Support                                                 16
7.1    Provision of Level 1 Support                                   16

8    Support and Maintenance                                         16
Notwithstanding your provision of Level 1 Support to End Users in accordance with clause 7.1, we will
provide you with support services and maintenance updates as set out in Schedule G.                16

9    Disbursement Costs                                              16

10   Your Licence                                                    17
10.1   Granting of the Licence                                        17
10.2   Licence Restrictions                                           17

11   Your Duties                                                     18

✪ MAXIMUM AVAILA

Application Service Provider Terms

11.1    General Business Operations
11.2    Marketing of the Software                                        19
11.3    End Users                                                        20
11.4    Your End User Contracts                                          21
11.5    Installation of the Software                                     22
11.6    Records and Audit                                                22


12    Our Duties                                                         23
12.1    Deliver Software                                                 23
12.2    Your access to Improvements                                      23
12.3    Sales support                                                    23
12.4    Software and documentation for Marketing Purposes                24


13    Delivery and Payment for Software                                  24
13.1    Delivery of Software and Risk of Loss                            24
13.2    Price and Payment Terms                                          25


14    Trade Marks and Copyright                                         26
14.1    Trademark Use During Agreement                                   26
14.2    Copyright and Trademark Notices                                  26
14.3    No Rights in Intellectual Property                               27
14.4    No Continuing Right                                              27
14.5    Obligation to Protect                                            27
14.6    End User Breaches                                                27
14.7    Failure of Trademark Protection                                  28


15    Indemnities                                                        28
15.1    Indemnity by Us                                                  28
15.2    No Combination Claims                                            29
15.3    Your Indemnity                                                   29


16    Warranties and Liability                                          30
16.1    Warranties                                                       30
16.2    Liability                                                        30
16.3    End User Warranty                                                31


17    Term and Termination                                              31
17.1    Term                                                             31
17.2    Extension of Customer Acquisition Term                           32
17.3    Termination for Cause                                            32
17.4    Automatic Termination                                           33

17.5    ASP Order Form Received After Termination Notice              33
17.6    Effect of Termination                                        34
17.7    Prior Rights                                                 34

## 18   General                                                      34

18.1    Dispute Resolution                                           34
18.2    Entire Agreement                                             35
18.3    Waiver and Modification                                      35
18.4    Notices                                                      35
18.5    Assignment                                                   36
18.6    Governing Law and Jurisdiction                               36
18.7    Benefits of Agreement                                        37
18.8    Time                                                         37
18.9    Survival of Terms                                            37
18.10   Severance                                                    37
18.11   Force Majeure                                                37
18.12   Good Faith                                                   38
18.13   Relationship of the Parties                                  38
18.14   Variation                                                    38

## 19   Definitions and Interpretation                               39

19.1    Definitions                                                  39
19.2    Interpretation                                               46

## Schedule A – Dispute Resolution Procedure                         49

## Schedule B – "powered by *noMAX" Logo                             51

## Schedule C – ASP Order Form                                       52

## Software Licence Purchase Order:                                  55

## Schedule D – Marketing Requirements                               57

## Schedule E – Technical Standards and Requirements                 59

## Schedule F – Level 1 Support Standards and Requirements           60

## Schedule G –Support and Maintenance                               61

1.      Software Support and Maintenance                             61
2.      Warranty and Liability                                       61

MAXIMUM AVAILAB

Application Service Provider Terms

<u>Schedule H – Special Conditions Addendum</u>

<u>End of Document</u>                                               65

⬡ MAXIMUM AVAILABILITY

ASP Application Service Provider Terms                                      Page 7

## 1 ASP Contract Details

### ASP Provider Details

Name:

Address:

Contact Name:                              Contact's Position:

Phone Number:                              Facsimile:

Contact Email:                             *noMAX ID:

Payment Terms:        As per ASP Order Form

### Software

Selected Software:    *noMAX garrison,        Minimum Initial      NIL
                      *noMAX defender,         Quantities:

### Commencement Date, Territory & Currency

Commencement Date:                            Territory:

Customer Acquisition   1 year                  Currency:           US$
Term

**Important Note:** The terms and conditions set out in this Agreement form the contract between you and us. You must therefore comply with and fulfil the obligations in this Agreement. Please ensure that you read and understand this entire Agreement prior to signing below.

## Execution

Signed for and on behalf of                   Signed for and on behalf of the ASP Provider:
Maximum Availability Limited:

Maximum Availability Limited

ASP Agreement Mar 06 (Ver2)

## Application Service Provider Terms

| | | | |
|---|---|---|---|
| Signature: | | Signature: | |
| Name: | Allan Campbell | Name: | |
| Title: | Director | Title: | |
| Date: | / / | Date: | / |

Application Service Provider Terms

## 2 ASP Order Process

### 2.1   Software Order Requirements

(a)   All your orders for the Software must be submitted on an ASP Order Form and shall not be binding on us until acceptance by us in writing or by Delivery, whichever is earlier.

(b)   In the case of acceptance by Delivery, which shall be taken to include transfer by electronic means, the order shall only be binding as to the portion of the order actually delivered.

### 2.2   Acceptance of ASP Order Form

(a)   We have the complete discretion to accept or reject any ASP Order Form.

(b)   We shall, on receipt of an ASP Order Form from you, send you an ASP Order Form Acknowledgement.

### 2.3   Rejection of ASP Order Form

(a)   If we have not accepted your ASP Order Form, in writing, within ten (10) Business Days of the ASP Order Form Acknowledgement Date, then the ASP Order Form shall be deemed to be rejected.

(b)   If you dispute the rejection of an ASP Order Form by us and choose not to submit an ASP Order Form on terms that we have advised you are acceptable to us, then you will have the burden of establishing that your actions were reasonable given that acceptance would mitigate any potential loss to you.

## 3 Marketing Performance

### 3.1   Marketing Obligations

Your marketing obligations under this Agreement are set out in Schedule D.

## 4 Initial Entitlements

### 4.1   Initial Entitlement

During the first six (6) month period following the Commencement Date, we shall provide you with:

(a)   One (1) online Software Sales Courses;

(b)   One (1) Marketing Materials Starter Pack; and

### 4.2   Technical Assistance

During the first six (6) month period following the Commencement Date, we will assist with the technical training of your staff by providing:

(a)   Two (2) online Supported Initial Software Demonstrations; and

(b)   Two (2) online Supported Initial Software Installations.

Maximum Availability Limited

Application Service Provider Terms

# 5 Hardware Records

(a)    To assist us in increasing the worldwide visibility of the Software and subsequent ASP sales volume increases, you must within 30 days of written request to do so provide us with a written report (in such form as we may from time to time specify) stating your reasonable estimate of the:

   (i)    Type of IBM hardware sold and/or procured by you in connection with End User Contracts;

   (ii)   Aggregate number of sales of IBM hardware; and

   (iii)  The total dollar amount of sales.

(b)    You grant us the right to disclose those records, as an aggregate figure without naming you to such strategic business partners as we think fit from time to time.

# 6 Technical Support

(a)    You are required to provide all technical services for End Users with whom you have an End User Contract.

(b)    You will at all times meet the terms of the Technical Standards and Requirements as set out in Schedule E.

(c)    If we are requested and agree to provide technical services other than your initial entitlements under clause 4.2 you will pay us the fees and expenses as specified in the invoice we will provide to you following the provision of the technical services, where payment is due within thirty days of receipt of the invoice.

# 7 Level 1 Support

## 7.1   Provision of Level 1 Support

(a)    You are required to provide Level 1 Support for End Users with whom you have an End User Contract.  You agree to, at all times, meet the Level 1 Support Standards and Requirements as detailed in Schedule F and as may be varied by us from time to time.

(b)    If we are requested and agree to assist with the provision of Level 1 Support that you are required to provide under this Agreement you will pay us the fees and expenses as specified in the invoice we will provide to you following the provision of Level 1 Support, where payment is due within thirty days of receipt of the invoice.

# 8 Support and Maintenance

Notwithstanding your provision of Level 1 Support to End Users in accordance with clause 7.1, we will provide you with support services and maintenance updates as set out in Schedule G.

# 9 Disbursement Costs

You shall arrange for any Telecommunication Facilities required for, and bear any Telecommunication Disbursements arising from, the following services provided to you or requested by you:

(a)    Software Sales Courses;

⬤ MAXIMUM AVAILABILITY

Application Service Provider Terms

Software Technical Certification;

(c)    Supported Initial Software Demonstrations;

(d)    Supported Initial Software Installations; and

(e)    All other technical support requested.

## 10    Your Licence

### 10.1 Granting of the Licence

The name "Maximum Availability", the Software and all Intellectual Property are protected by copyright laws and international copyright treaties. We grant you a non-exclusive licence to:

(a)    Demonstrate the Software to existing and potential End Users in the Territory;

(b)    Install the Software on your computer system for the purpose of demonstrating the Software to existing and potential End Users in the Territory; and

(c)    Lease the Software (including any relevant associated documentation) to End Users on the terms specified in clause 11.4, in the Territory, subject to our prior receipt and acceptance of an ASP Order Form. Except as otherwise specified in this Agreement, you shall also be bound by all the terms and conditions of the ASP EULA.

### 10.2 Licence Restrictions

You must not:

(a)    Permit any other person to use the Software except under the terms of the Agreement; or

(b)    Modify, translate, reverse engineer, decompile, disassemble (except to the extent that this restriction is expressly prohibited by law) or create derivative works based on the Software, including without limit works based upon the database structure within the Software; or

(c)    Copy the Software, except for normal system operation or back-up or archival purposes. All copies must contain all original proprietary notices; or

(d)    Resell, rent, lease, transfer, or otherwise transfer rights to the Software except under this Agreement; or

(e)    Apply updates generated on a Primary Computer that does not have a Primary Licence on a Target Computer.

## 11    Your Duties

### 11.1 General Business Operations

In addition to any other obligations you may have under the Agreement, you:

(a)    Shall conduct business in a manner that reflects favourably on our goodwill and reputation and consistent with industry quality standards;

(b)    Shall use all reasonable business processes put in place from time to time by us to help optimise business efficiency;

(c)    Shall at your own cost, maintain sufficient capacity, facilities and personnel (including technical and sales) to carry out your obligations under this Agreement;

(d)    Shall utilise our Software only in the object code format as received from us, and only on the tangible media as received from us;



Application Service Provider Terms

(e)    Shall comply with our programs for in-warranty replacement and post warranty support for the Software in accordance with any Issued Directions;

(f)    Shall operate from an appropriate place of business located in the Territory which is open for business and permanently staffed during normal business hours; and

(g)    Shall comply with all Laws.

## 11.2 Marketing of the Software

In addition to any other obligations you may have under this Agreement, you shall:

(a)    act diligently to promote the Software, including adhering to all advertising standards as may be communicated to you from time to time.

(b)    not engage in deceptive, misleading or unethical practices that may be detrimental to us or the Software;

(c)    not make any representations or warranties to End Users concerning the Software that are inconsistent with or additional to those made in the Agreement or by us;

(d)    distribute the Software with all packaging, warranties, disclaimers and ASP EULA intact as provided by us;

(e)    implement and maintain marketing procedures that meet any reasonable standards that we disclose to you.  We may, upon reasonable notice, visit your offices for the purpose of advising you on the promotion and marketing of the Software;

(f)    obtain our consent in advance to utilise our brands, logos and other marketing materials other than as set out in this Agreement;

(g)    ensure that any Marketing Materials used are the current version  and ensure that no prior or outdated versions of the Marketing Material are used;

(h)    answer queries about the Software from potential End Users or forward those queries to us where you are not able to sufficiently answer the query or answer it in a reasonable time frame;

(i)    on a continuing basis, monitor the performance of your Software Sales Representatives to ensure that your Software Sales Representatives are complying with the terms of the Agreement;

(j)    on a continuing basis, advise us of any market information that comes to your attention regarding the Software, our market position or the competitiveness of the Software in the marketplace;

(k)    provide us, on each Commencement Date Anniversary, with a non-binding twelve (12) month forecast of your anticipated End User Contracts; and

(l)    not market the Software in any way which implies that the Software is the proprietary property of anyone other than us.

## 11.3 End Users

(a)    Prior to providing the Software to any End User, including Software which is subject to a trial period, you shall inform the potential End User that its use of the Software is subject to the End User accepting the terms and conditions of the ASP EULA.  You will be required to obtain and submit to us written acceptance of the ASP EULA by the End User and the relevant CPU serial and model numbers before we will release a Licence Key for the Software.  You will disclose to us all Software that you provide to an End User.

(b)    You acknowledge and agree that we may amend the ASP EULA from time to time at our sole discretion, provided however that we shall provide at least sixty (60) days notice in advance to you before introducing the amended ASP EULA.

## 11.4 Your End User Contracts

(a)    You shall comply with all Laws relating to the entry into or performance of End User Contracts.

Maximum Availability Limited


**MAXIMUM AVAILABILITY**

    In consideration of us agreeing to supply the Software on an ASP basis for the fees specified on the Price List, you agree to act as our agent and secure the following terms and conditions for our benefit in any End User Contracts you enter into:

    (i)     The End User acknowledges and accepts the ASP EULA;

    (ii)    Except for its obligations under the ASP EULA, Maximum Availability shall not be liable to the End User for any act or default, or otherwise, in connection with the End User Contracts;

    (iii)   Maximum Availability shall have the right to inspect the End User's hardware to ensure compliance with the terms of the ASP EULA; and

    (iv)   The End User acknowledges that you are inserting subclauses (i)-(iii) as agent for Maximum Availability, and that Maximum Availability may therefore enforce and rely upon those subclauses at its discretion.

(c)    Upon the expiry of the Customer Acquisition Term you shall not enter into any End User Contracts.

(d)    You shall not lease the Software to End Users for a term greater than 36 months, unless you have obtained our prior written consent.

### 11.5 Installation of the Software

(a)    Installation and services may only be carried out by a Certified Technician.

(b)    At all times, at least two (2) of your permanent technical staff must be Certified Technicians;

(c)    Your Certified Technicians must have Software Technical Certification for a New Release by the earlier of:

    (i)     Software Demonstration or Software Installation of the New Release; or

    (ii)    Six (6) weeks following the General Availability of the New Release,

(d)    Your Certified Technicians shall provide all Level 1 Support of the Software.

### 11.6 Records and Audit

(a)    You shall maintain adequate books and records in connection with your activities under this Agreement.  Such records shall include, without limitation, records of the number of End Users and name, address and contact details for each End User.

(b)    You shall make those records available to us for audit when requested by us.  We shall only make a request for audit where we have reasonable grounds for believing that you have not made full and complete disclosure to us in relation to those records as required by this Agreement.

(c)    You shall provide us with access to all of your machines on which our Software is loaded, and facilitate our access to End User's hardware to ensure compliance with the terms of this Agreement and the ASP EULA.

## 12    Our Duties

### 12.1 Deliver Software

We shall Deliver Software to you which has been ordered by you and accepted by us in accordance with clauses 2 and 13.1.



Application Service Provider Terms

### 12.2 Your access to Improvements

We shall notify you of any updates, modifications and functional improvements we develop for the Software. Any such modifications or improvements shall be subject to the provisions of this Agreement.

### 12.3 Sales support

We shall provide general support, advice and assistance regarding the use of the Software. This may take the form of answering questions about the operation and functions of or guidance for the operation of the Software. Notwithstanding the above, such support shall only be provided for the current release and version of the Software in effect from time to time and the immediate preceding release of the Software for a period of one year from the date of issue of the current release.

### 12.4 Software and documentation for Marketing Purposes

We will provide you with one copy of the Software and relevant technical and user documentation at no charge for the purpose of providing product demonstrations and training of staff and prospects only. This documentation is our Intellectual Property and you may only reproduce the documentation for your internal purposes in complying with this Agreement. You must return the Software and the documentation to us on termination of this Agreement.

## 13    Delivery and Payment for Software

### 13.1 Delivery of Software and Risk of Loss

(a)    While we will take all reasonable steps to provide the Software in a timely manner, we shall not be liable for any damages to any person for failure to Deliver or for any delay or error in Delivery of the Software.

(b)    We will use reasonable efforts to meet your requested Delivery schedule for the Software, but we may refuse, cancel or delay Delivery to you if you in our reasonable opinion, have failed to perform your obligations under this Agreement, including failure to pay any outstanding amounts pursuant to this Agreement.

(c)    If orders for the Software exceed our available inventory, we will allocate our available inventory and make Delivery on a basis that we, in our sole discretion, deem equitable. We may also discontinue the publication, manufacture or distribution of any or all of the Software components at any time. No such cancellation, refusal or delay will be deemed a termination (unless we so advise you) or breach of the Agreement by us

(d)    All risk of loss of, or damage to, the Software will pass to you upon Delivery by us to the carrier or you, whichever first occurs.

### 13.2 Price and Payment Terms

(a)    You will pay us a monthly Lease Fee for all ASP Software Contracts. The monthly price of each new licence for the Software will be the price set out in the Price List. We shall have the right to amend the Price List, at any time with at least sixty (60) days prior notice to you. Such change shall, however, not apply to any ASP Order Form we accept prior to the effective date of such change.

(b)    Our Price List does not include any national, state or local sales, use, value added or other taxes, customs duties, or similar tariffs and fees which we may be required to pay or collect upon the Delivery of the Software or upon collection of the Lease Fees. In the event any Lease Fees payable by you to us are subject to any such costs, you shall pay to us an additional amount such that following such payment, we receive the amount we would have received had no such withholding been made.

(c)    Notwithstanding that we may publish recommended ASP fees, you are free to determine your own ASP fees to your End Users.

(d)    If you request us to supply items other than the Software, such as hardware, services or other software, we will provide an invoice following the supply where payment is due within thirty days of receipt of this invoice.

(e)    All payments shall be made:

     (i)    In the currency set out in clause 1, free of any withholding tax, and of any currency control or other restrictions;

     (ii)    To us at the address designated by us and must include any applicable taxes, shipping and other charges; and

     (iii)    In accordance with the payment terms specified in clause 1.

# 14     Trade Marks and Copyright

## 14.1 Trademark Use During Agreement

(a)    During the term of the Agreement, you are authorised by us to use the Intellectual Property for your activities under this Agreement. You must comply with any Issued Directions as to the use of the Intellectual Property and shall cease using the same when directed by us.

(b)    You shall prominently display the "powered by *noMAX" logo, as depicted in Schedule B or as otherwise notified to you by email from time to time, on all documents and products relating to the Software.

(c)    You shall not distribute, lease or license the Software under any trademark or brand other than that of *noMAX.

## 14.2 Copyright and Trademark Notices

You shall include on each copy of the Software that you distribute, and on all containers and storage media for the Software, all trademark, copyright and other notices of proprietary rights included by us on the Software. You agree not to alter, erase, deface or overprint any such notice on anything provided by us.

## 14.3 No Rights in Intellectual Property

Nothing contained in this Agreement shall give you any interest in the Intellectual Property. You shall not do anything that may adversely affect the validity or enforceability of the Intellectual Property.

## 14.4 No Continuing Right

Upon expiration or termination of this Agreement, you shall forthwith cease all display, advertising and use of the Intellectual Property. This provision shall survive the termination of this Agreement.

## 14.5 Obligation to Protect

You acknowledge that the Software and any modification made to the Software comprise valuable property rights. You will maintain all information and data contained in the Software and any modifications made to the Software by us, in strict confidence for us. You shall take all reasonable steps to ensure that no unauthorised person shall have access to the Software and that all authorised persons having access to the Software shall refrain from any disclosure, publication, proliferation copying or use prohibited by this Agreement. You shall forthwith notify us of any facts or other information, which come to your notice, which indicate any loss of the confidentiality imposed by this clause.

Application Service Provider Terms

### 14.6 End User Breaches

You shall promptly report to us any breach by any person of the ASP EULA of which you become aware, and of the making by any person of any unauthorised copy of any the Software. We shall have the right, but not the obligation, to pursue any or all of such infringements.

### 14.7 Failure of Trademark Protection

In the event that we do not secure trademark registration in the Territory, this Agreement shall continue in full force and effect and you shall make no claim whatsoever against us.

## 15    Indemnities

### 15.1 Indemnity by Us

We agree to defend, indemnify and hold you harmless for any loss, damage or liability for any claimed infringement of any patent right, copyright and trade secrets, or other proprietary rights asserted by any third person arising out of your use of the Software, provided:

(a)    that you promptly notify us in writing of any such claim against you,

(b)    that you authorise us to assume sole control over the defence of any such claim thereafter, together with the right to settle or compromise such claim, and

(c)    that you make available to us such information, assistance and authority as may be reasonably requested by us in order to enable us to defend any such claim.

In the event any such claim is asserted, we may without limitation and at our option:

(d)    obtain such rights and/or licences from the claimant as may be necessary to enable you to continue using and/or marketing the Software which are the subject of the claim, and/or

(e)    modify the Software with respect to which such claim is asserted so as to avoid further claimed infringement by such person.

### 15.2 No Combination Claims

Notwithstanding clause 15.1 we shall not be liable to you for any claim arising from or based upon the combination, operation or use of the Software with equipment, data or software not supplied or approved by us, or from any alteration or modification of the Software not made by us.

### 15.3 Your Indemnity

(a)    You now indemnify us and shall keep us fully indemnified against any costs, losses, claims, or damages (including legal fees and disbursements on an attorney and own client basis) incurred or suffered as a consequence of any default or breach of your obligations to us under this Agreement.

(b)    Provided that we comply with the ASP EULA, you shall indemnify us and keep us fully indemnified against any costs, losses, claims, or damages (including legal fees and disbursements on an attorney and own client basis) arising from End User Contracts.

## 16    Warranties and Liability

### 16.1 Warranties

We warrant that the Software, as updated and when properly used, will perform substantially in accordance with its accompanying documentation, and the Software media will be free from defects in

Maximum Availability Limited

materials and workmanship, for a period of sixty (60) days from the date of receipt. This warranty is void if the Software fails as a result of accident, abuse, or misapplication. To the maximum extent permitted by law, we disclaim all other warranties, either express or implied, including, but not limited to, any implied warranties of merchantability or fitness for a particular purpose, non-infringement of title, with regard to the Software and the accompanying documentation. We do not, unless otherwise specifically stated, warrant that the Software will comply with any statutory or regularity requirements in any particular territory that may be applicable to operation of the Software.

## 16.2 Liability

If we breach:

(a)     any condition or warranty expressly stated in this Agreement;

(b)     any condition or warranty which cannot legally be excluded from this Agreement; or

(c)     any other obligation (statutory, express or implied) relating to this Agreement (whether in contract, tort (including negligence), statutory or otherwise);

our entire liability and your exclusive remedy shall be limited to the total Lease Fees paid by you under this Agreement in the twelve (12) month period preceding the breach (or, if there is more than one breach, the date of the first breach).

Except as expressly provided above and to the maximum extent permitted by applicable law, we shall not be liable for any damages whatsoever (including, without limitation, damages for loss of business profits, business interruption, loss of business information, or other pecuniary loss) arising out of the use of or inability to use the Software even if we have been advised of the possibility of such damages.

No claim arising out of this Agreement, regardless of form, may be brought by any Party more than two years after the event that gave rise to that right of claim.

## 16.3 End User Warranty

We warrant that we shall fully and faithfully honour our obligations to all End Users pursuant to the ASP EULA. Satisfaction by us of our obligations pursuant to the ASP EULA shall be our sole liability, and your sole remedy against us, on account of any claim relating to the quality or performance of any of our Software, whether such a claim shall be passed upon principles of contract, or warranty, negligence or other tort, breach of statutory duty, or otherwise.

# 17     Term and Termination

## 17.1 Term

This Agreement shall have effect as from the Commencement Date and shall remain in force and effect:

(a)     Until the last expiry date of any End User Contracts validly entered into during the Customer Acquisition Term; or

(b)     Until terminated in accordance with clauses 17.3 or 17.4.

## 17.2 Extension of Customer Acquisition Term

The Customer Acquisition Term may be extended if:

(a)     You give written notice of a request for extension no later than thirty (30) days prior to expiry of the Customer Acquisition Term; and

(b)     In our absolute discretion we decide to extend the Customer Acquisition Term and notify you of the same in writing.

Application Service Provider Terms

Upon the expiry of any extended Customer Acquisition Term, the Parties may agree to further successive extensions by the process described above.

## 17.3 Termination for Cause

Notwithstanding any other provisions of this Agreement we may immediately terminate this Agreement by notice in writing to you if:

(a)   you purport to assign or transfer this Agreement, including (without limit) where you, in our judgement, merge, consolidate, sell all or substantially all of your assets or implement or suffer any substantial change in management or Control without our prior written agreement.  Such agreement will not be arbitrarily and unreasonably withheld;

(b)   in our reasonable opinion, any of the events set out in the preceding paragraph is imminent or likely to eventuate;

(c)   you commit any breach of this Agreement which is either incapable of remedy or, if the breach is capable of remedy, is not remedied within thirty (30) days of our written demand to do so;

(d)   you fail to pay any amounts payable to us for a period of at least thirty (30) days after payment becomes due; or

(e)   you fail to perform any other obligation, warranty, duty or responsibility or are in default with respect to any term or condition under this Agreement and such failure or default is not remedied within thirty (30) days of our written demand to do so.

## 17.4 Automatic Termination

Notwithstanding any other provisions of this Agreement, this Agreement shall terminate automatically, with no further act or action of either Party, if:

(a)   a receiver, liquidator or statutory manager is appointed for you or your property or you become subject to a winding up order otherwise than for the purpose of reconstruction;

(b)   you make an assignment for the benefit of your creditors; or

(c)   any proceedings are commenced by, for or against you under any bankruptcy, insolvency or debtor's relief law, or if you are liquidated or dissolved and such action, in our reasonable opinion, has or is likely to have a detrimental effect on us.

## 17.5 ASP Order Form Received After Termination Notice

If any notice of termination of this Agreement is given, we will be entitled to reject all or part of any ASP Order Forms received from you after notice but prior to the effective date of termination.

## 17.6 Effect of Termination

Upon termination (including expiry) of this Agreement:

(a)   all accepted ASP Order Forms or portions of the Software not Delivered as at the effective date of termination shall automatically be cancelled;

(b)   for a period of twelve (12) months after the date of termination, you shall make all your books and records that pertain to your performance of this Agreement available to us for inspection and copying; and

(c)   you shall cease using the Intellectual Property.

## 17.7 Prior Rights

Any termination shall be without prejudice to the rights of either Party to recover from the other any monies due under this Agreement and to the rights or remedies of either Party in respect of any antecedent breach of this Agreement.

# 18  General

## 18.1 Dispute Resolution

The Parties agree to use their best efforts to resolve any dispute which may arise under the Agreement through good faith negotiations. Except as provided in the clause, neither Party shall commence any arbitration or litigation in relation to this Agreement unless it has first invited the chief executive of the other Party to meet with its own chief executive for the purpose of endeavouring to resolve the dispute on mutually acceptable terms. Any dispute arising under the Agreement which cannot be settled by negotiation between the Parties or their respective representatives shall be submitted to arbitration in accordance with the procedures specified in Schedule A. The Parties shall continue to perform their obligations under the Agreement as far as possible as if no dispute had arisen pending the final settlement of any matter referred to dispute resolution pursuant to this clause. Nothing in this clause shall preclude either Party from taking immediate steps to seek urgent equitable relief.

## 18.2 Entire Agreement

The Agreement represents the whole of the contract and understanding between the Parties and replaces all prior agreements and understandings between the Parties with respect to the subject matter of the Agreement.

## 18.3 Waiver and Modification

No delay, neglect or forbearance by either Party in enforcing against the other any provision of the Agreement will be a waiver, or in any way prejudice any right, of that Party. However the rectification of any given instance of a breach of this Agreement by the breaching Party shall operate as a waiver in respect of that particular instance rectified.

## 18.4 Notices

Any notice required to be given by this Agreement shall be given in writing either personally, by post, by facsimile, by email or by document transmittal service to the required recipient's last known address for that type of communication and will be deemed effective:

a)      after two (2) clear Business Days, if served by post, from the time of posting; or

b)      after four (4) hours after receipt, if sent by facsimile, provided receipt occurs before 5.00 pm on a Business Day or otherwise at 10.00 am on the next Business Day; or

c)      after the date and time stated as the date and time of receipt on the delivery receipt e-mail confirming the delivery of the notice e-mail; or

d)      after one (1) clear Business Day if sent by any other form of recognised urgent document transmittal service such as courier or document exchange.

A Party may change its address for service and its notified facsimile number by notice in writing served on the other Party. Service shall be affected in accordance with this clause.

## 18.5 Assignment

Neither Party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other Party. Notwithstanding the above, we may assign the Intellectual Property and any subsidiary rights associated with the Intellectual Property to any third party at any time.

## 18.6 Governing Law and Jurisdiction

This Agreement is governed by and shall be construed in accordance with the law of New Zealand (but expressly excluding the United Nations Convention on Contracts for the International Sale of

Application Service Provider Terms                                            Page

Goods – Vienna, 1980 and the Consumer Guarantees Act 1993). You may bring a suit, action or proceeding against us in relation to this Agreement only in a New Zealand Court.

Nothing in this clause shall affect our right to bring any suit, action or proceeding with respect to this Agreement against you in any competent court in any jurisdiction other than New Zealand whether concurrently or not or to serve process in any other manner permitted by law.

## 18.7  Benefits of Agreement

The terms of this Agreement are intended solely for the benefit of the Parties. They are not intended to confer upon any third party the status of a third party beneficiary.

## 18.8  Time

Time shall be of the essence as regards any date or period determined under this Agreement save only to the extent that any such date or period may be altered by mutual agreement between the Parties.

## 18.9  Survival of Terms

The covenants, conditions and provisions of this Agreement which are capable of having effect after the expiration of the Agreement shall remain in full force and effect following the expiration of this Agreement.

## 18.10    Severance

If any provision of this Agreement is held to be invalid, illegal or unenforceable, such provision will be severed and the remainder of the Agreement will remain in full force and effect.

## 18.11    Force Majeure

Neither Party will be liable for any act, omission, or failure to fulfil its obligations under this Agreement to the extent that such act, omission or failure arises from any cause reasonably beyond its control including acts of God, strikes, lockouts, riots, acts of war, terrorist attacks, epidemics, governmental action after the date of this Agreement, fire, communication line failures, power or hardware failures, earthquakes or other disasters (called "Force Majeure"), but excluding any obligation to pay money.

The Party unable to fulfil its obligations due to Force Majeure will immediately notify the other in writing of the reasons for its failure to fulfil its obligations and the effect of such failure and use its reasonable endeavours to avoid or remove the cause and perform its obligations.

## 18.12    Good Faith

The Parties agree to act in good faith towards one another and to use their best endeavours to comply with the spirit and intention of this Agreement.

## 18.13    Relationship of the Parties

Except as specified in this Agreement neither Party is a partner, employee or agent of the other or has the power or authority, directly or indirectly or through its servants or agents, to bind the other to any agreement with any person. Neither Party shall make any contrary representation to any person.

## 18.14    Variation

No modification or alteration of, or addition to any of the provisions of this Agreement shall be made unless agreed to by the Parties in writing.

Maximum Availability Limited

✪ MAXIMUM AVAILABILITY

# 19  Definitions and Interpretation

## 19.1 Definitions

Whenever used in this Agreement, unless the context otherwise requires:

| | |
|---|---|
| Agreement | means the following documents in order of priority, including any schedule, annexure or appendix: |
| | a)  Special Conditions Addendum; and |
| | b)  These standard Application Service Provider Terms. |
| Apply | means the application of updates and "Applied" and "Applies" have corresponding meanings where capitalised. |
| ASP Certified Technician | means a Certified Technician who has met the criteria as set down by us from time to time and who has been awarded ASP Technical Certification by us specifying their advanced training in operation of the Software in an ASP environment. |
| ASP EULA | means the ASP End User Licence Agreement, containing terms under which End Users are licensed to use the Software as specified in our current version (from time to time) of the ASP EULA as available from us on request. |
| ASP Extranet | means the website that we have made available to you as an ASP. |
| ASP Order Form | means an ASP Order Form for the Software in the form set out in Schedule C, which may be varied by us from time to time. |
| ASP Order Form Acknowledgement | means an acknowledgement by us, in writing, confirming receipt of your ASP Order Form. |
| ASP Order Form Acknowledgement Date | means the date of the ASP Order Form Acknowledgement. |
| ASP Technical Certification | means certification granted by us to Certied Technician(s) on meeting the requirements as detailed on the ASP Extranet and/or available from us on request which may be varied by us from time to time. |
| Business Day | means any day on which banks in Auckland New Zealand are open for business, but shall not include either Saturday or Sunday. |
| Certified Technician | means a person(s) who has met the criteria as set down by us from time to time and who has been awarded Software Technical Certification by us specifying their competence to install the Software. |
| Commencement Date | is the commencement date set out in clause 1. |
| Commencement Date Anniversary | means an anniversary of the Commencement Date. |
| Control | means the holding (directly or indirectly) of a majority of voting rights in any company or other legal entity, or the right to appoint or remove a majority of the board of directors or management of any company or other legal entity, and "Controlled" and "Controls" have corresponding meanings. |

⊗ MAXIMUM AVAILABILITY

Application Service Provider Terms                                    Page 2

| | |
|---|---|
| Customer Acquisition Term | means the term within which you may enter into new End User Contracts, as specified in clause 1. |
| Delivery | means transfer of the Software and/or Licence Key(s) by whatever means appropriate including but not limited to electronic transfer, and "Deliver" has a corresponding meaning. |
| End User | means a customer who has entered into an End User Contract with you and who signs an ASP EULA for the Software. |
| End User Contract | Means the contract between you and the End User in respect of the Software, which may include terms and conditions governing any or all of support, maintenance and hosting services. |
| General Availability | means the date on which we announce publicly, by way of press release, that the Software is generally available. |
| Intellectual Property | means all of our rights conferred under statute, common law and equity in and in relation to inventions, designs, trademarks, trade names (including, in relation to us, our names and the name of the Software), logos and get up, circuit layouts, confidential information and copyright and any other intellectual property rights; |
| iSeries Machine | means an IBM® iSeries server. |
| iSeries Sales Representative | means a person employed or engaged by you to sell IBM® iSeries Servers or other hardware or software designed to operate with or on an IBM® iSeries Server. |
| Issued Direction | means any direction issued by us, including without limitations, directions relating to legal, ethical or technical issues concerning your relationships with End Users and your use of Intellectual Property.  Issued Directions may be contained in any written form including a manual, notice or email. |
| Laws | means any legislation, statute, regulation, ruling, code, rules, ordinance, order in council or other instrument from time to time applying to your activities under this Agreement. |
| Level 1 Support | means the first point of support provided to the End User in the situation where it experiences problems and questions related to the use of the Software, including assistance with implementation and proper operation of the Software but does not include provision of fixes to Software errors. |
| Lease Fee | Means the Software Lease Fee specified in an ASP Order Form accepted by us. |
| Licence Key | means the encrypted code required to enable the Software to function as specified by the ASP EULA. |
| Marketing Materials | means marketing materials for the Software as listed on the ASP Extranet and/or available from us on request, which may be varied by us from time to time. |
| Marketing Materials Starter Pack | means initial supplies of marketing materials as may be varied from time to time. |
| New Release | means a new release of the Software. |
| our | means Maximum Availability Limited. |
| Parties | means the parties to this Agreement and "Party" means any one of the Parties. |

Maximum Availability Limited

⊙ MAXIMUM AVAILABILITY

| | |
|---|---|
| Price List | means the price list for the Software, updated from time to time, as available from us on request. |
| Primary Computer | means a computer on which updates to be Applied by the Software are generated |
| Primary Licence | means a Licence for the use of the Software on a Primary Computer. |
| Software | means the software specified in clause 1 and includes any accompanying software, media, and on-line or printed documentation, and software updates. |
| Software Demonstration | means a demonstration of the Software carried out according to the methodology posted on the ASP Extranet and/or available from us on request, which may be varied by us from time to time. |
| Software Installation | means an installation of the Software in accordance with the methodology posted on the ASP Extranet and/or available from us on request which methodology may be varied by us from time to time. |
| Software Sales Course | means a web delivered sales course on the Software as detailed on the ASP Extranet and/or available from us on request which may be varied by us from time to time. |
| Software Sales Guide | means the sales guide for the Software provided by us which may be varied by us from time to time. |
| Software Sales Representatives | means iSeries Sales Representatives that have undertaken a Software Sales Course and are employed or engaged by you to lease the Software. |
| Software Technical Certification | means certification granted by us to technical staff on meeting the requirements as detailed on the ASP Extranet and/or available from us on request which may be varied by us from time to time. |
| Special Conditions Addendum | means a Special Conditions Addendum in the form attached in Schedule H and any other special conditions as agreed in writing by the Parties. |
| Supported Initial Software Demonstration | means one of the first two (2) Software Demonstrations that you arrange, which we will provide to you for no charge, except for Telecommunication Disbursements. |
| Supported Initial Software Installations | means one of the first two (2) Software Installations that you arrange, which we will provide to you for no charge, except for Telecommunication Disbursements. |
| Telecommunication Disbursements | means expenses and costs for telephone communications including, but not limited to, toll charges, conference call facilities and internet charges. |
| Target Computer | means a computer on which updates are Applied by the Software. |
| Target Licence. | means a Licence for the use of the Software on a Target Computer |
| Telecommunication Facilities | means telecommunication facilities including, but not limited to, conference call facilities, internet access, video conferencing facilities. |
| Territory | means the territory set out in clause 1. |
| us | means Maximum Availability Limited. |
| US$ | means United States dollar. |

Maximum Availability Limited

Application Service Provider Terms

⬡ MAXIMUM AVAILABILITY

| We | means Maximum Availability Limited. |
|---|---|
| you/your | means the Party specified as the ASP Provider in clause 1. |

## 19.2 Interpretation

In this Agreement, unless the context otherwise requires –

(a)  Where a word or phrase is given a particular meaning, other parts of speech and grammatical forms of that word or phrase have corresponding meanings.

(b)  A reference to a statute, ordinance, code or other law includes regulations and other instruments under it and consolidations, amendments, re-enactments or replacements of any of them.

(c)  Words importing the singular include the plural and vice versa.

(d)  A reference to a person includes a reference to the person's executors, administrators, successors, and substitutes (including, but not limited to, person taking by novation) and permitted assigns.

(e)  The word "person" shall include references to any natural person, company, corporation, firm, partnership, joint venture, society, organisation, or other group or association of persons (whether incorporated or not), trust, state or agency of state, statutory or regulatory body, local authority, government or governmental or semi-governmental body or agency (in each case whether or not having separate legal personality).

(f)  If a period of time is specified and dates from a given day or the day of an act or event, it is to be calculated exclusively of that day.

(g)  A reference to a day is to be interpreted as the period of time commencing at midnight and ending twenty-four hours later.

(h)  Any reference to any times or dates are references to New Zealand standard time.

(i)  Unless otherwise agreed, all prices, sums of money and payments referred to in this Agreement shall be in the currency set out in clause 1.

(j)  Headings and marginal notes are inserted for convenience and do not affect the interpretation of this Agreement.

# Schedule A – Dispute Resolution Procedure

## 1.    Application of Dispute Resolution Procedure

Any dispute, controversy or claim arising out of or relating to this contract shall be determined by arbitration in accordance with the following procedures and the Arbitration Act 1996 (New Zealand).

## 2.    Initiation of Dispute Resolution

Any Party may refer a dispute to arbitration by giving notice to the other Party and also to the President for the time being of the New Zealand Law Society (referred to as the "President") that it seeks a matter in dispute to be referred to arbitration. The notice shall set out the matter in dispute in sufficient detail to enable the other Party to be adequately informed as to the nature of the dispute.

## 3.    Procedure For Appointment Of Arbitrator

Any dispute shall be heard by a single Arbitrator, which Arbitrator shall:

a)    be appointed by the Parties, if they can agree on a single Arbitrator; or

b)    be appointed by the President, if the Parties cannot agree on a single Arbitrator.

Any Arbitrator appointed shall act as an expert and have skills in law, information technology, accounting and experience in commercial matters.

If a Party objects to the appointment of a particular Arbitrator then that Party may object within three Business Days of receiving notice of that Arbitrator's appointment. If the objection establishes that the proposed Arbitrator could not reasonably be expected to have the confidence of the objecting Party then the President shall appoint another Arbitrator in consultation with the Parties to the dispute.  The President's decision on any further appointment shall be final. Any determination of the Arbitrator will be binding and shall not be reviewable in any Court of law except to the extent that it may involve an error of law. The terms of appointment of the Arbitrator shall, if the Parties fail to agree, be fixed by the President.

## 4.    Decision of Arbitrator

The Arbitrator may in addition to the powers of an arbitrator under the Arbitration Act 1996, appoint an expert to investigate and report to the Arbitrator on any matter requiring decision.

The decision of the Arbitrator on any matter so referred to the Arbitrator shall be final and binding on the Parties.

The arbitrator may, in the arbitrator's unfettered discretion, determine and award the costs of the Dispute.

Unless the decision of the Arbitrator contains an award of costs the Parties shall bear all the costs of the arbitration equally.

Application Service Provider Terms

## Schedule B – "powered by *noMAX" Logo

[TO BE INSERTED]

...cation Service Provider Terms

# Schedule C – ASP Order Form

Maximum Availability Limited
Suite B, Building D, 42 Tawa Drive, Albany, Auckland
PO Box 300 523, Albany, Auckland, New Zealand
Phone: +64 9 415 7008 Fax: +64 9 415 7018

**ASP PROVIDER DETAILS:**

| | |
|---|---|
| ASP Provider Name: | |
| Contact Name: | |
| Position: | |
| Phone number: | Facsimile: |
| Contact Email: | |

**CUSTOMER DETAILS:**

| | |
|---|---|
| Company Name: | |
| Physical Address: | |
| Postal Address:<br>(if different) | |
| Country: | |
| Contact Name: | |
| Position: | |
| Phone number: | Facsimile: |
| Contact Email: | |

**Documents Attached:**

&#9711;  ASP EULA        You must attach a completed ASP EULA.

**Important Note:**  You submit this ASP Order on the terms and conditions set out in the Maximum Availability Limited ASP Terms (ASPT/1.0).

**PAYMENT TERMS:**

Maximum Availability Limited

MAXIMUM AVAILABILITY

## Application Service Provider Terms

Page

### Software/System Details:

| | End User iSeries Machine | ASP Provider iSeries Machine |
|---|---|---|
| Model Number:<br>(e.g. 820-0150(not 9406)) | \_\_\_-\_\_\_\_ | \_\_\_-\_\_\_\_ |
| Processor Group:<br>(e.g. P20) | P\_\_ | P\_\_ |
| CPU Serial Number: | \_\_\_-\_\_\_\_\_ | \_\_\_-\_\_\_\_\_ |
| OS Version: | V\_ R\_ | V\_ R\_ |

### Software Licence Purchase Order:

| | | |
|---|---|---|
| *noMAX Product: | | |
| Used for:<br>(delete as appropriate) | PRIMARY / PRIMARY & TARGET | PRIMARY & TARGET<br>for use only with updates generated by /<br>applied to the End User iSeries Machine<br>identified on this ASP Order Form. |
| Active Processors: | | |
| End User Contract<br>Commencement Date: | | |
| End User Contract Term: | | |
| Software Lease Fee: | | |

### Acceptance:

Signed for and on behalf of the ASP Provider:

Signature:

Name:

Title:

Date:         /         /

### Acceptance:

Signed for and on behalf of Maximum Availability Ltd:

Signature:

Name:

Title:

Date:         /         /

Maximum Availability Limited

## <u>Schedule D – Marketing Requirements</u>

(a)   You must actively promote the Software to your client base by:

    (i)   Ensuring all of your iSeries Sales Representatives attend a Software Sales Course to become a Software Sales Representative within four (4) weeks of the Commencement Date;

    (ii)   Ensuring all of your iSeries Sales Representatives and Software Sales Representatives attend a Software Sales Course within six (6) weeks following the General Availability of each new release of the Software;

    (iii)   Ensuring all of your Software Sales Representatives have a copy of the latest Software Sales Guide;

    (iv)   Executing a marketing agreement for the promotion of the Software, agreeable to us, within 6 weeks of execution of this Agreement and annually thereafter during the Customer Acquisition Term.

    (v)   Maintaining a sufficient stock of Marketing Materials to properly promote the Software; and

    (vi)   Such other marketing obligations as notified by us to you from time to time.

(b)   You must at all times, have at least one (1) Software Sales Representative.

Application Service Provider Terms

# Schedule E – Technical Standards and Requirements

At all times;

(a)     at least two (2) of your permanent technical staff are ASP Certified Technicians;

(b)     all of your ASP Certified Technicians successfully complete a Software Technical Certification for a New Release by the earlier of:

(i)      Software Demonstration or Software Installation of the New Release; or

(ii)     Six (6) weeks following the General Availability of the New Release;

(c)     your ASP Certified Technicians are competent in the use of the features of the iSeries machine;

(d)     technical services provided utilising the Software meet or exceed the expected industry norms for services of that kind.

# Schedule F – Level 1 Support Standards and Requirements

Level 1 Support Requirements:

(a)     At all times, at least two (2) of your permanent technical staff are Certified Technicians;

(b)     All of your Certified Technicians undertake Software Technical Certification for a New Release by the earlier of:

      (i)     Software Demonstration or Software Installation of the New Release; or

      (ii)    Six (6) weeks following the General Availability of the New Release;

(c)     Your Certified Technicians shall provide all Level 1 Support of the Software; and

(d)     At all times, at least one (1) of your Certified Technicians shall be available to provide immediate Level 1 Support in a manner acceptable to us.

# Schedule G – Support and Maintenance

## 1.    Software Support and Maintenance

We will provide you with updates for the Software for the term of this Agreement ("Maintenance").

Updates consist of new releases of the Software which provide functional enhancements and error corrections. All such updates shall be deemed to be part of the Software and shall be subject to the terms and conditions of this Agreement. Maintenance includes release updates and version upgrades of the Software, but does not include upgrades from one Software product to another (for example, *noMAX Defender™ to *noMAX Garrison™).

We shall provide you with support ("Support") for the Software. Support will be provided by us or by another designated party certified by us. Support shall include telephone help desk support (which will be available 24 hours per day 7 days per week), remote diagnostics, emergency bug fixes, and other such workarounds to ensure the Licensed Software conforms to the agreed functionality and technical specifications. Remote Support shall be delivered by use of Webex software or similar. You will provide the necessary communications access and infrastructure to facilitate remote Support.

We shall not be required to provide you with any Support or updates following termination of this Agreement.

## 2.    Warranty and Liability

The following provisions are without prejudice to any rights you may have at law which may not be legally excluded.

We warrant that the Maintenance updates will perform substantially in accordance with their accompanying documentation and the Maintenance updates will be free from defects in materials and workmanship for a period of sixty (60) days from the date of receipt. This warranty is void if the Maintenance updates fail as a result of accident, abuse, or misapplication.

If we breach any warranty or other provision of this Schedule, or any other obligation (statutory, express or implied) relating to this Schedule (whether in contract, tort (including negligence), statutory or otherwise) our entire liability and your exclusive remedy shall be, at our option, either:

(a) return of the Lease Fees paid by you in the three month period prior to the relevant cause of action arising; or

(b) repair or replacement of the Maintenance update(s) that do not meet the warranty.

To the maximum extent permitted by law, we disclaim all other warranties (statutory, express or implied) including, but not limited to, any implied warranties of merchantability or fitness for a particular purpose, non-infringement or title, with regard to the Support services, Maintenance updates and the accompanying documentation.

Except as expressly provided above and to the maximum extent permitted by applicable law, we shall not be liable for any damages whatsoever (including, without limitation, damages for loss of business profits, business interruption, loss of business information, or other pecuniary loss) arising out of the Support services or the use of or inability to use the Maintenance updates even if we have been advised of the possibility of such damages.

# Schedule H – Special Conditions Addendum

Special Conditions Addendum No:    1 of 1

## Special Condition #1

O    Deletion of clause:

O    Amendment to clause:

O    New clause to be inserted as
clause:

For amendments and new clauses
insert new wording here:

If there are further Special Conditions please copy and paste the table above.

## Execution

| Signed for and on behalf of Maximum Availability Limited: | | Signed for and on behalf of the ASP: | |
|---|---|---|---|
| Signature: | | Signature: | |
| Name: | Allan Campbell | Name: | |
| Title: | Director | Title: | |
| Date: | /    / | Date: | /    / |

_____ End of Document

THE DEPARTMENT OF INTERNAL AFFAIRS

*Te Tari Taiwhenua*

APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1.    Country: New Zealand
      This public document

2.    has been signed by Robert Victor Eades

3.    acting in the capacity of Notary Public

4.    bears the seal/stamp of Robert Victor Eades

Certified

.     at: Wellington                          6. the 22 June 2009

.     by: The Department of Internal Affairs

      No: 09164.1a

      Seal/Stamp:                             10. Signature:

The purpose of this certificate is only to confirm that the signature, seal or stamp on the document
is genuine. It does not mean that the contents of the document are correct or that the Authentication
Unit of the Department of Internal Affairs approves of the contents.

**EXHIBIT B**



## TO ALL TO WHOM THESE PRESENTS SHALL COME

I, **Robert Victor Eades** of Auckland in New Zealand, Notary Public, duly authorised, admitted and sworn and practising within New Zealand, DO HEREBY CERTIFY;

1.  On 17 June 2009 **Christopher Robert Darlow** ("Chris Darlow") who is personally known to me, attended on me and produced to me the attached copy of his arbitral award dated 15 April 2009 ("the document").

2.  Chris Darlow signed the document in my presence.

3.  I have affixed my seal to the document and have signed the same for the purpose of authenticating it.

IN TESTIMONY WHEREOF I have hereunto subscribed my name and affixed my seal of office at Auckland aforesaid this 17th day of June 2009.

In Faith and Testimony



*Querre*

Notary Public
Auckland
New Zealand

ROBERT VICTOR EADES
SOLICITOR: NOTARY PUBLIC
WYNYARD WOOD
LEVEL 15, TOWER ONE
51-53 SHORTLAND ST
AUCKLAND
NEW ZEALAND

X0906016_RVE.DOC:agc.v1



IN THE MATTER OF THE ARBITRATION ACT 1996

BETWEEN

CLAIMANT       **MAXIMUM AVAILABILITY LIMITED**, a duly incorporated company in Auckland

RESPONDENT    **COMPUTER BUSINESS SOLUTIONS, INC**, a duly incorporated company in Oklahoma

---

### ARBITRAL AWARD

---

THE MATTER OF THE ARBITRATION ACT 1996

BETWEEN

CLAIMANT          **MAXIMUM AVAILABILITY LIMITED**, a duly incorporated company
                  in Auckland

RESPONDENT      **COMPUTER BUSINESS SOLUTIONS, INC**, a duly incorporated
                  company in Oklahoma

**Background**

1.      I am required to adjudicate on claims brought by Maximum Availability Ltd
        *(MA)* (a New Zealand company in business developing and supplying
        specialised software (known as high availability/disaster recovery software))
        against Computer Business Solutions Inc *(CBSI)*, a US corporation in
        business as a software reseller.  MA and CBSI are parties to a "Application
        Service Provider Contract" *(ASP Agreement)* with a commencement date of 1
        July 2007 under which MA licensed CBSI to supply the software described
        above (called *noMAX) to end users.

2.      The ASP Agreement required, inter alia, CBSI to pay MA software installation
        costs plus monthly "lease fees" calculated according to *noMAX end user
        contracts entered into by CBSI. Clause 13.2(a) of the ASP Agreement and
        accompanying End User Licence Agreements *(EULAs)* signed with each end
        user refers.

3.      MA claims CBSI to be in breach of the ASP Agreement and each EULA in that
        CBSI:

        (a)      has failed to pay MA installation and lease fees in relation to four actual
                 end user contracts CBSI signed (*Claim A*);

        (b)      has failed to enter into 26 further end user contracts as promised to MA
                 immediately before or at the time the ASP Agreement was signed

therefore depriving MA of revenue as would have been generated by those contracts (*Claim B*);

MA claims compensation arising from these breaches. It also claims reimbursement for out of pocket costs it has incurred as a direct result of the breaches (*Claim C*) plus interest on such amounts as may be awarded in its favour (*Claim D*).

4.    I deal with each claim below. CBSI has not participated in this arbitration. It has not filed a defence to MA's points of claim nor filed evidence in response to statements filed by MA's witnesses. It has not responded to MA's submissions in support of its claim and it was not represented at the arbitration hearing held in Auckland on 19 March 2009. I note that the ASP Agreement is to be interpreted according to New Zealand law (clause 18.6).

**Claim A**

5.    MA says CBSI entered into the four end user contracts the details of which appear in paragraph 11 of MA's amended points of claim (dated 20 February 2009). MA claims it is entitled to software installation and monthly lease fees in respect of each of these end user contracts for the period of each of those contracts, the relevant amounts being those specified. Mr B Campbell, chartered accountant, has given uncontested evidence as to the sum due to MA in relation to this claim. Mr Campbell calculates the net sum due as being $US88,745.10.

6.    I have two observations in relation to this claim:

(a)    I calculate of the amount due to MA in relation to Claim A as being a little higher than that calculated by Mr Campbell. However I accept Mr Campbell's calculations as being correct;

(b)    Part of claim A relates to monthly lease fees not yet due. While I can find no provision accelerating these payments due to MA upon the ASP Agreement terminating, clause 17.7 provides that MA remains entitled



to receive all monies due under the ASP Agreement despite such termination. MA claims the ASP Agreement has terminated through CBSI having sold its assets to a third party and having been "liquidated" (see paras 38 of MA's Amended Points of Claim and 42 of Mr A Campbell's 30 January 2009 evidence statement). I make no finding in this respect. A sale of assets without a purported assignment of the ASP Agreement does not give rise to an automatic termination. And there is no evidence pointing to CBSI having been placed in official management as contemplated by cl 17.4(a) and (c). Nonetheless it is clear to me CBSI, whatever its status, will not be voluntarily paying the remaining Claim A lease fees as fall due after the date of this award. I do not discount my award in this respect. This element has a bearing however on MA's interest entitlement which I deal with in paragraph 13 below.

## Claim B

7.    Claim B is a little more involved. MA asserts it agreed to discount installation costs and monthly lease fees charged in relation to two of the four *noMAX software end users CBSI actually contracted with in return for CBSI promising to contract with a further twenty six end users (thirty end users in all). As previously noted payments CBSI were required to make to MA were calculated according to *noMAX end user contracts organised by CBSI.

8.    Detail supporting MA's claims in this respect are set out in the first evidence statement of Mr A Campbell (paras 11 -14) and the evidence statement of Ms H Jones (paragraph 4). Given this evidence is not disputed by CBSI I accept it. I find that MA agreed to reduce software installation costs and monthly lease fees from the applicable MA price list to the rates charged in relation to the Foley Equipment and Outdoor Cap end user contracts.

9.    MA has filed detailed submissions as to the legal character of the CBSI promise and MA's lease fee concessions. I see no need to analyse the various grounds MA advances. Rather I find the ASP Agreement as signed by Mr A Campbell for MA and Mr Downing for CBSI did not in fact comprise all



the agreed terms between MA and CBSI. I find CBSI agreed to enter into no less than thirty end user contracts. MA agreed to vary its price list as described above. CBSI entered into just four end user contracts. MA is entitled to be compensated for the revenue it lost through not receiving the installation and lease fees in relation to the "undelivered" twenty six end user contracts.

10.     In so finding I have taken account of clause 18.2 (entire agreement) and 18.14 (variation) of the ASP Agreement. This is a case however where the parol evidence rule should not apply. Given the timing and content of the communications between Messrs A Campbell and Downing dated 24 May 2007 and 5 June 2007 respectively it is clear the ASP Agreement (a standard form of contract in my view) was not intended to form the entire agreement. I adopt the reasoning of Fisher J in Newmans Tours v Ranier [1992] 2NZLR 68, 81 in this respect.

11.     As regards to compensation CBSI must pay MA for its failure to enter into the 26 end user contracts promised I have considered Mr B Campbell's assessment (schedule 2 to his evidence statement). Mr Campbell makes various assumptions including end user contract start dates and terms. While there may have been room for CBSI to challenge Mr Campbell's assumptions it has not done so. I therefore find CBSI to be liable to MA for $US809,856.00 in net revenue MA lost through CBSI's breach.

## Claim C

12.     MA's third claim against CBSI are for indemnity costs. Clause 15.3 of the ASP Agreement refers. I find clause 15.3 to be clear. Since CBSI is in default of its obligations it must reimburse MA for the third party costs it has incurred. These are set out in paragraph 78 of MA's amended submissions in total $US58,607.22. The calculation is substantiated by Mr B Campbell. I find for MA accordingly.



**Claim D**

13.    MA seeks interest at the Judicature Act 1908 rate of 7.5% p.a. on the above amounts.  Mr B Campbell provides a simple but inadequate calculation of interest.  I can not see how interest can run on amounts which are not yet due (see paragraph 6(b) above).  Nor can I establish the date or dates on which the calculated interest runs.  I make no award for interest.  I invite MA to make such further submissions on this aspect if it wishes.

**Other matters**

14.    MA makes detailed reference to purported communications on CBSI's part in or about September 2007 whereby CBSI cancelled the ASP Agreement on the basis of MA's alleged breaches. MA asserts these communications were contrived. MA has made extensive submissions in this respect via its US legal counsel (exhibit Q to Mr A Campbell's first evidence statement) and in the evidence presented in this arbitration. CBSI has not refuted MA's position. I find CBSI did not cancel the ASP Agreement in September 2007.

**Conclusion**

As a result of the above findings I award MA the following:

| Claim A | $US88,745.10 |
|---|---|
| Claim B | $US809,856.00 |
| Claim C | $US58,607.22 |
| | $US957,208.32 |

My costs in this matter total $NZ9,677.02 (incl GST) which given my findings I order CBSI to pay. This amount is added to the sum of $US957,208.32 referred to above





Chris Darlow
Arbitrator
15 April 2009
Auckland, New Zealand